**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**

| | | |
|---|---|---|
| HEIDI L. WHITE, individually and on behalf of all others similarly situated, | § | |
| | § | Case No. 6:26-cv-00201-H |
| Plaintiff, | § | |
| | § | |
| v. | § | **FIRST AMENDED** |
| | § | **COMPLAINT - CLASS ACTION** |
| MERCOR.IO CORPORATION (d/b/a MERCOR), | § | |
| | § | |
| | § | |
| Defendant. | § | |

## INTRODUCTION

1. Plaintiff Heidi L. White ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant Mercor.io Corporation, d/b/a Mercor ("Mercor"). She alleges the following based upon personal knowledge as to her own acts and experiences and upon information and belief as to all other matters.

2. This action arises from Mercor's systematic misclassification of its workforce as independent contractors. Mercor is an American artificial intelligence hiring startup that provides experts to train AI models and chatbots. The company's three founders became the youngest self-made billionaires in 2025 and the fast-growing company is currently valued at approximately $10 billion.

3. The company's stunning growth is due at least in part to its business model of engaging a roster of more than 30,000 "experts" that Mercor publicly reports. Mercor supplies the labor of these "experts" to leading artificial-intelligence developers, including OpenAI, Anthropic, and Meta, to train their models. These companies are engaged in a fast-paced arms race to build and develop the most superior AI models, and their need for data and training is insatiable. Mercor has made billions because it is able to provide this service, and it can do so because it does not take the time and money to hire these "experts" as employees.

4. Instead, Mercor treats these workers as independent contractors even though Mercor's day-to-day conduct and public statements reflect an employment relationship under any of the legal tests that govern this question.

5. Mercor enjoys tremendous business advantages by treating these workers as independent contractors and reporting their compensation on Forms 1099-NEC rather than W-2s. First, it shifts the employer-side payroll-tax burden onto the workers. Mercor avoids the cost of traditional employee benefits. Mercor avoids significant costs for employee-benefit plans. Mercor also avoids the recordkeeping, withholding, and reporting obligations that federal and Texas law impose on employers.

6. Mercor's misclassification is not inadvertent—it is even advertised as a benefit. Mercor's website expressly tells its clients that engaging Mercor relieves them of "worker misclassification risk." This shows both Mercor's awareness of the misclassification issue and Mercor's decision to assume that risk on behalf of its clients.

7. Mercor's Chief Executive Officer has publicly described the workers as "hires" and described Mercor as "managing these workforces of tens of thousands of people." And Mercor's public-facing support documentation acknowledges that Mercor engages in classic employer behavior. Mercor dictates hours and weekly availability. Mercor monitors the workers' screens minute by minute through a mandatory surveillance application called "Insightful." Mercor sets pay rates without negotiation. It trains and supervises its workers through layered quality-control review. Mercor also states that it "performance-offboards" contractors who fall short of project expectations. In other words, they fire them.

8. Plaintiff brings this action on behalf of herself and a Nationwide Class. The Nationwide Class is composed of all individuals in the United States who, during the relevant limitations period, performed paid AI training, data labeling, evaluation, model review, safety review, coding tasks, expert consultations, or related project work through Mercor's platform or Mercor-administered project systems, and whom Mercor treated as non-employee contractors for payroll, tax, or personnel-record purposes.

9. Plaintiff also seeks to represent targeted subclasses:

a) an Audit-Deduction Subclass of workers from whose Insightful-logged time Mercor deducted hours before payout;

b) an Off-Insightful Policy Subclass of workers whose work projects required uncompensated preparatory and review work off the Insightful timekeeping application;

c) a Section 7434 Subclass for workers for whom Mercor filed Forms 1099-NEC;

d) a Texas Subclass for state-law claims; and

e) a Federal Rule of Civil Procedure 23(b)(2) Current-Worker Injunctive Subclass.

10. Plaintiff seeks the following relief:

a) for ERISA purposes only, a declaration that she and the Class are common-law employees of Mercor under the federal common-law agency test. Any worker-status finding the Court must make to resolve Count II (the § 7434 claim) is part of that statutory claim itself; Plaintiff does not seek a separate declaratory judgment of worker status for tax purposes;

b) statutory damages under 26 U.S.C. § 7434 for the willful filing of fraudulent Forms 1099-NEC;

c) restitution and damages for breach of the parties' express written agreement to pay for hours worked, including hours worked off the Insightful timekeeping tool that Mercor refused to compensate;

d) restitution and damages for unjust enrichment to the extent Plaintiff, the Texas Subclass, and any later-certified state-law subclasses, as appropriate, have borne out-of-pocket costs that Mercor's misclassification shifted onto them;

e) recovery of any benefits owed under, or accrued under, any plan Mercor maintains that is governed by the Employee Retirement Income Security Act of 1974, together with appropriate equitable relief under 29 U.S.C. § 1132(a)(3); and

f) prospective declaratory and injunctive relief, on behalf of the Current-Worker Injunctive Subclass and limited to Mercor's administration of any ERISA-governed plan it maintains, requiring Mercor to credit current Subclass members with the service, eligibility, and accrual time to which they are entitled as common-law employees.

## PARTIES

### A. Plaintiff

11. Plaintiff Heidi L. White is a natural person and citizen of the State of Texas. She resides in Tom Green County.

12. Ms. White has worked for Mercor as a purported independent contractor since about October 6, 2025. In that capacity she has performed subject-matter-expert evaluation work and peer-review work for Mercor's clients across multiple Mercor project assignments.

13. She has been paid both on an hourly basis (with hours tracked through Mercor-required Insightful software) and on a per-task basis at rates Mercor unilaterally fixed.

14. For tax year 2025, Mercor filed with the IRS and furnished to Ms. White a Form 1099-NEC reporting her pay as nonemployee compensation. Ms. White paid self-employment tax on that amount, including the employer equivalent tax burden that would not have fallen on her had Mercor treated her as an employee.

**B. Defendant**

15. Defendant Mercor.io Corporation, doing business as Mercor, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 181 Fremont Street, Fl 33, San Francisco, California 94105. Mercor's public legal-support materials identify a federal employer-identification number ending in -1971.

16. Mercor was founded in or about January 2023 by three college dropouts. By October 2025 the company raised a $350 million round of funding. That equity issuance was completed at a $10 billion valuation, making the three then 22-year old founders the world's youngest self-made billionaires. Brendan Foody, one of the founders, is Mercor's Chief Executive Officer.

17. Mercor operates a platform to provide artificial-intelligence training data to artificial-intelligence developers. Mercor's clients have included OpenAI, Anthropic, and Meta.

18. Mercor is a citizen of Delaware and California for purposes of diversity jurisdiction.

**JURISDICTION & VENUE**

19. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Employee

Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq.; 26 U.S.C. § 7434; and 28 U.S.C. §§ 2201–2202. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

20. This Court additionally has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the proposed Class contains more than 100 members; and (c) at least one member of the proposed plaintiff class is a citizen of a state different from Defendant Mercor. Plaintiff is a citizen of Texas, and Defendant Mercor is a citizen of Delaware and California.

21. This Court has personal jurisdiction over Mercor because Mercor purposefully avails itself of the privilege of conducting business in Texas by engaging Texas residents as contractors, collecting personal data from Texas residents, transmitting payment to Texas residents, and operating the technology platform on which Plaintiff and other Texas-resident class members performed work.

22. Mercor is also registered as a foreign corporation in Texas under Texas Secretary of State File Number 0806149251, with an effective registration date of July 30, 2025, and maintains an active right to transact business in Texas through its registered agent, Corporation Service Company, located at 211 East 7th Street, Suite 620, Austin, Texas 78701. Plaintiff's claims arise out of and relate to Mercor's contacts with this District.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to Plaintiff's claims occurred here.

24. Mercor contracted with Plaintiff while she was in Tom Green County, Texas. It sent her onboarding materials, standard agreements, project engagement letters, availability forms, instructions, training materials, and performance feedback to her Texas-based devices.

25. Mercor required Plaintiff to install and run Insightful on a personal computer located in Texas. Through Insightful, Mercor captured screenshots, application metadata, and activity data from that Texas device.

26. Mercor calculated, audited, deducted, and paid compensation to Plaintiff in Texas through Stripe and Wise. It also furnished Plaintiff's 2025 Form 1099-NEC to her Texas address.

27. The San Angelo Division is appropriate because Plaintiff resides in Tom Green County, which is within this Division.

## FACTUAL ALLEGATIONS

### A. Mercor's Business Model and Workforce

28. Mercor was founded in or about January 2023. Its business is to recruit, vet, engage, manage, and supply human workers who create AI training data, evaluate AI outputs, conduct peer and safety review, and perform related work for AI developers.

29. Mercor's public materials describe it as an "AI talent platform" and an "AI-powered recruiting and talent platform." Its revenue comes principally from supplying the labor of its contractor workforce to corporate clients.

30. Plaintiff alleges on information and belief that Mercor began engaging the long-term, surveillance-tracked contractor workforce at issue no later than January 1, 2024, after raising its seed round and scaling its contractor placement infrastructure.

31. Mercor publicly reports a roster and network of more than 30,000 "experts" engaged to perform paid project work for Mercor's clients. Mercor's clients have included OpenAI, Anthropic, and Meta, among others. Brendan Foody, one of Mercor's three founders, is Mercor's Chief Executive Officer.

32. Mercor is a profitable and well-resourced company with access to sophisticated legal and tax counsel. Mercor reported a revenue run rate of more than $75 million in early 2025, more than $100 million by March 2025, and approximately $500 million by late 2025.

33. In October 2025, Mercor closed a $350 million Series C financing led by Felicis Ventures, with participation from Benchmark, General Catalyst, and Robinhood Ventures. The round valued Mercor at approximately $10 billion. This made Mercor's three 22-year-old founders the world's youngest self-made billionaires.

34. Mercor requires every worker who seeks paid work on the platform to sign standard form agreements. Those agreements include a Worker Agreement and

a Confidential Information and Inventions Assignment Agreement or "CIIAA." Together, those documents are referred to here as the "Worker Agreement."

35. In the course of her work for Mercor, Plaintiff has electronically signed multiple iterations of Mercor's agreements, including an Offer Letter, Work Trial Worker Agreement, Worker Agreement, and CIIAA.

36. For each of Plaintiff's projects with Mercor, Mercor's online worker portal displays a "Documents" page that displays a document titled "Mercor Terms of Work," a document titled "CIIAA," an Offer Letter, and an Engagement Letter. The previous four documents are listed as signed on a particular date, but when Plaintiff downloads the documents from the portal, they are unsigned.

37. For at least four of Plaintiff's contracts, the portal displays the same single "Mercor Terms of Work" and indicates it as signed on April 23, 2026, regardless of the contract's offer date or project.

38. The material terms of Mercor's agreements are uniform as confirmed by Mercor's public legal support materials. In response to whether a worker may add or remove clauses, Mercor states: "[t]he agreement is standardised [sic] for all contractors to ensure fairness and consistency, so we're unable to remove or amend individual sections."[1]

39. Plaintiff alleges on information and belief that, from January 1, 2024 through the filing of this Complaint, Mercor has used materially identical standard agreements with the individuals who perform paid work on its platform.

[1] *See* Mercor, *Legal Support*, https://talent.docs.mercor.com/support/legal (last visited May 8, 2026).

40. Plaintiff further alleges on information and belief that Mercor has applied materially uniform onboarding, availability, hour cap, performance review, offboarding, payment, and Form 1099-NEC reporting practices during the same period.

41. For hourly workers, Mercor has applied materially uniform Insightful monitoring, time logging, weekly review, and deduction practices. For per-task workers, Mercor has applied materially uniform pricing, quality review, and bonus-tournament practices (in which Mercor pays escalating bonuses to per-task workers who exceed Mercor-set task thresholds, as described below).

42. Mercor's support documentation, Incentive Structure guide, and the CEO's public statements describe the same engagement model. Mercor's contracting, payroll, Insightful, Stripe, and Wise records will confirm the scope and uniformity of these practices.

43. Mercor also confirms that, for each project, it generates an "Engagement Letter" available from the project dashboard and captioned "Engagement Letter — Signed by Mercor."[2]

44. The Worker Agreement recites that the worker is an independent contractor and that the services are outside Mercor's usual course of business, but those recitals are contradicted by Mercor's conduct. The labor Plaintiff and the Class perform for AI developers, under Mercor's management, is Mercor's core business.

---

[2] *See* Mercor, *Legal Support*, https://talent.docs.mercor.com/support/legal (last visited May 8, 2026).

45. The Worker Agreement labels the relationship as independent contracting. At the same time, it gives Mercor control characteristic of an employer.

46. Among other provisions, the agreement reserves to Mercor the right to demand "supporting evidence to demonstrate quality and quantity of Services completed"; requires performance "satisfactory to the Company"; bars subcontracting or delegation without written authorization; requires the worker to report to a Mercor representative on a schedule left to Mercor's discretion; bars use of AI tools without Mercor's written authorization; imposes a two-year non-solicit; and prohibits the worker from working directly or indirectly for a client or other organization to which Mercor introduces the worker.

47. The Worker Agreement also contains tax-shifting, indemnity, and limitation language that Mercor may try to invoke. Those provisions are void, inapplicable, ambiguous, or unenforceable to the extent Mercor uses them to avoid statutory obligations, employee status consequences, agreed compensation, or employer payroll duties resulting from Mercor's own misclassification.

48. The limitation provision also refers to "CONSULTANT," an undefined term in the Worker Agreement. It cannot reasonably be read to authorize Mercor to withhold agreed fees or shift employer payroll obligations created by misclassification.

49. The privacy provision in Mercor's Worker Agreement recites that Mercor collects and uses "Personal Information" for purposes including "performance management, training, discipline; supporting and managing personnel . . .

monitoring personnel conduct and compliance with the Company Group's policies and practices." Those purposes describe an employer-employee relationship rather than an arm's-length contractor engagement.

### B. Mercor's Public Admissions Concerning Its Workforce

50. Mercor markets its services to clients in staffing terms. Its public "Black Box vs. Open Box" guide explains that a client not using Mercor would have to "build a human data team themselves," including by hiring a larger internal team and by sourcing, vetting, engaging, managing performance, and terminating contractors for an annotator team.[3]

51. Mercor markets itself as performing those functions for clients. The same guide states that Mercor will notify and offboard underperforming annotators, source and onboard new annotators within hours or days, and do so proactively based on metrics.

52. Mercor's pricing model also resembles staffing. Its "Incentive Structure" guide states that, under the "cost-plus" model Mercor uses, the vendor and client decide what compensation is appropriate for the talent, and the vendor takes a fixed percentage.[4]

53. Mercor's "contractors" do not negotiate their own rates with clients. Mercor mediates the relationship, sets the contractor's pay, and sells the labor to clients at a markup.

---

[3] *See* Mercor, *Black Box vs. Open Box*, https://www.mercor.com/docs/blackbox-vs-open-box/ (last visited May 8, 2026).
[4] *See* Mercor, *Incentive Structures*, https://www.mercor.com/docs/incentive-structure/ (last visited May 8, 2026).

54. Mercor expressly tells clients that using Mercor reduces misclassification risk. Its Incentive Structure guide states: "Based on the incentive structure you choose, you can face different levels of worker misclassification risk. Mercor handles [it] on your behalf, so you can avoid dealing with risks of misclassification, including financial penalties and legal action."[5]

55. This statement shows that Mercor (1) knows about the risk of treating the workers like independent contractors rather than employees, (2) sells clients a service with the benefit of avoiding that risk, and (3) places itself between the clients and the workforce as the entity responsible for that risk.

56. Mercor's published guidance to clients confirms that Mercor uses real-time monitoring software to track and manage its workers. Its "Incentive Structure" guide states: "Tools such as Hubstaff are often used to track time spent, as well as provide accountability for how the work was produced."[6] The guide further recommends to clients: "Monitor time efficiency for each annotator, and manage annotators accordingly if there are obvious outliers."[7] That description is of employer-style oversight by Mercor's own description, applied to a workforce that Mercor classifies as independent contractors.

57. Mercor's CEO, Brendan Foody, has repeatedly used employment language to describe Mercor's "contractor" workforce.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

58. In a February 20, 2025 CNBC television interview about Mercor's Series B financing, Mr. Foody stated that Mercor is used by leading AI labs to "hire thousands of people" to train large language models. He also said Mercor was "actively hiring many hundreds of people" in fields including software engineering, medicine, law, accounting, and other knowledge-work domains.

59. At the TechCrunch Disrupt 2025 conference on or about November 5, 2025, Mr. Foody described Mercor as "managing these workforces of tens of thousands of people." He stated that "60% of our new hires" were coming through referrals and through "performance reviews" showing who was doing well on jobs and why.

60. At the same November 2025 conference, Mr. Foody was asked whether Mercor's model represented a "new gig economy." He responded that the projects were "converging with what you would think a full-time work environment looks like," including Slack collaboration, teams, performance reviews, and work that feels like "jobs."

61. Mr. Foody also described Mercor's value proposition to workers as providing "a reliable job that pays them well" and said Mercor was paying approximately $1.5 million per day in contractor compensation, with an average rate then around $95 per hour. At that compensation level, the 7.65% employer Social Security and Medicare contribution Mercor avoids through misclassification approximates $115,000 per day, or more than $40 million annualized, before unemployment taxes, workers' compensation premiums, and benefits.

62. Mr. Foody has also boasted about how quickly Mercor can "hire" workers (which is made possible by the misclassification). In a May 4, 2026 post from his verified X account, @BrendanFoody, Mr. Foody stated: "just hired 10,000 people in 4 days." Counsel has preserved a true and correct screenshot of that post.

### C. Mercor's Workforce Composition and Compensation Structure

63. Mercor's contractor workforce consists largely of credentialed white-collar professionals. In connection with the AI Productivity Index, or APEX, Mercor recruited senior professionals from institutions including Goldman Sachs, JPMorgan Chase, McKinsey & Company, Boston Consulting Group, and Latham & Watkins.

64. Mercor has stated that APEX participants averaged 7.25 years of professional experience. APEX co-authors include a former McKinsey global managing director, a former dean of Harvard Business School, and a Harvard Law School professor.

65. Mercor's broader workforce includes lawyers, doctors, bankers, software engineers, accountants, and other credentialed professionals. Mercor's publicly stated average rates have ranged from approximately $81 to $95 per hour, and exceed $200 per hour for workers Mercor calls "Senior Domain Experts."

66. The workers' credentials do not make them independent contractors. Skilled workers are employees when they apply their expertise inside a company-directed production process rather than through an independent business of their own.

67. The APEX project illustrates the point. It was not a discrete outside consulting engagement in which independent businesses delivered their own product to Mercor. Mercor recruited and assembled domain specialists to perform Mercor-assigned work for Mercor's AI benchmark product.

68. Mercor set the objectives, specifications, deliverables, and format of the work. It integrated the resulting work into its business. It paid fixed hourly rates that Mercor set, including stated rates for Senior Domain Experts. Workers' compensation depended on Mercor-assigned work, not entrepreneurial profit or loss.

69. That sustained, Mercor-directed, business-integrated work is consistent with employee status, notwithstanding the Worker Agreement's contrary label.

### D. Mercor Engages Individuals Only, Not Independent Businesses

70. Mercor engages individuals, not independent businesses. It does not allow workers to provide services through a corporation, limited liability company, partnership, or other business entity.

71. The Worker Agreement and Worker Invention Assignment Agreement (referred to in Mercor's onboarding materials by both the "CIIA" and "CIIAA" abbreviations) are signed by the worker personally. Identity verification through Persona requires personal government identification. Mercor reports compensation on Forms 1099-NEC bearing the individual's name and Social Security number, not an entity name and Employer Identification Number.

72. By barring workers from contracting through any business entity, Mercor removes a core feature of real independent contracting and structures the relationship as a personal service relationship between Mercor and the worker.

73. Mercor pays the individual through Stripe, which is payment processing software typically used by e-commerce sites and apps. Project assignments, availability forms, performance scoring, Insightful monitoring, Slack access, and Okta credentials are all tied to the individual worker.

**E. The Worker Agreement Onboarding Process**

74. Every person seeking paid work from Mercor must sign the Worker Agreement and Worker Invention Assignment Agreement as a condition of receiving work or pay. The agreements are presented through Mercor's online onboarding process for clickwrap acceptance. Workers cannot negotiate terms and cannot begin earning until they sign.

75. Before work begins, Mercor also requires workers to submit to Persona identity verification, complete a background check, attend mandatory onboarding, install Insightful, accept a Mercor email account, use Okta single sign-on, join a Mercor-administered Slack workspace, and execute any project NDA Mercor or its clients require.[8]

76. The Mercor Contracts are standardized, non-negotiable agreements presented as a condition of receiving work or pay. Mercor itself states that the form

[8] *See* Mercor, *Project and Onboarding Support FAQ*, https://talent.docs.mercor.com/support/project (last visited May 8, 2026).

is “standardised” and that it “is unable to remove or amend individual sections.” Workers cannot begin earning until they sign.

### F. Mercor Controls Workers’ Hours, Schedules, and Availability

77. Mercor workers do not set their schedules in any meaningful business sense. Mercor’s support materials state that weekly hour limits are set based on project needs, client requirements, and worker availability. Requests to adjust weekly hours must be discussed with project owners and remain subject to project policies.

78. In practice, Mercor—not the worker—decides how many hours a worker may work on a project.

79. Each worker is assigned a “Project Point of Contact” (“POC”) and a “Designated Responsible Individual” (“DRI”), Mercor personnel who direct, supervise, and approve the worker’s assignments. Mercor’s support documentation states that “once your contract is accepted, any project-related or contract-specific questions should be directed to the project DRI,” and that “only the DRI can confirm or approve project-level details or changes.”

80. Mercor requires its workers to complete a weekly availability questionnaire on each project, identifying when they will be available and approximately how many hours they intend to work that week. Workers are required by protocol to notify Mercor in advance if they will be reducing their hours or taking time off.

81. Mercor caps total contractor work at 80 hours per week across all engagements. Its support materials state that workers may work only up to their

assigned weekly cap, that additional hours require advance approval from the project POC, and that hours beyond the approved cap will not be paid.

82. Mercor also pauses and resumes projects unilaterally. Its support materials state that project pauses are determined at the project or client level, not at the request of individual contributors, and that work is halted for everyone until the project team or client decides to resume.

83. Mercor terminates engagements unilaterally and without cause. Mercor's published list of reasons a contract may be terminated includes "Performance offboarding, if work consistently fails to meet project expectations … the project team may initiate a corrective process and ultimately end the contract if improvements aren't observed." That description tracks the language of employer discipline.

### G. Mercor Controls Workers' Compensation and Audits Their Logged Time

84. Mercor sets pay rates and refuses to negotiate them. Its support materials state that pay rates are based on the role, project requirements, budget, and evaluation outcomes, are fixed for the duration of a project, and cannot be reviewed or adjusted mid-project.

85. Per-task rates are uniform across contractors doing the same task. Project pricing is set by Mercor before the worker is engaged.

86. Mercor audits logged time and deducts time before payout. Its support materials state that Mercor conducts a weekly review to decide whether hours reflect productive work. Mercor may remove hours based on Insightful screenshots,

idle time, work outside scope, duplicate tracking, or possible use of automation or prohibited AI.

87. Mercor also controls whether time may be logged at all. Its documentation states that workers must not begin working or logging hours until Insightful access is confirmed and the project team has expressly instructed them to start. Work completed without Insightful tracking is not eligible for payout.

88. Mercor thus decides not only what work is assigned, but whether a worker's time counts for pay.

89. Workers are paid weekly through Mercor-controlled, third-party payment processors (Stripe or Wise) used at Mercor's election to disburse worker pay. Mercor's documentation describes the payment cadence: "Payments are processed each Wednesday through Stripe or Wise. Funds generally arrive within 3 to 7 business days." Workers do not invoice Mercor; Mercor calculates and disburses pay on its own schedule, after deducting any hours it deems non-productive.

90. Mercor's compensation system also includes bonuses, promotions, internal titles, and review priority, all administered by Mercor.

91. For example, Mercor has operated a weekly volume-bonus tournament under which contractors who reach a Mercor-set threshold of approved tasks receive bonuses, with additional payments for approved tasks above the threshold. Mercor announces winners in Mercor-run Slack channels and urges others to produce more tasks.

92. Mercor maintains internal workforce titles for workers, including "Superwriter" and "Senior Domain Expert," and advances workers based on Mercor's performance judgments. Plaintiff has personally been promoted within Mercor's internal structure more than once.

93. Mercor also controls review priority. Higher-performing contractors can receive faster review and approval cycles, which affects their earnings. These are features of an employer-managed workforce, not a relationship among independent businesses.

94. Mercor's unilateral control over the timing of approvals further demonstrates that the workers have no meaningful opportunity for profit or loss based on managerial skill. Mercor sets bonus deadlines, such as midnight on a particular day, but the contractor cannot reach the deadline by her own efforts because Mercor controls when submitted work is reviewed and approved. A contractor who submits qualifying work before Mercor's announced deadline may nonetheless be denied the corresponding bonus because Mercor's reviewers approve the work after the deadline has passed. The contractor has no recourse and no ability to avoid the loss through any management decision of her own; the outcome turns on Mercor's review pace.

### H. Mercor Requires Compensable Work Off the Insightful Timekeeping Tool

95. Mercor publicly states that work performed off Insightful is not eligible for payout. At the same time, Mercor's actual practices require workers to perform necessary project work off Insightful that they are not permitted to log.

96. Mercor policies exclude time spent brainstorming task approaches, running grading and trajectory work to validate outputs, and similar preparatory or review activities from compensable Insightful time. Those activities are integral to the assignments Mercor gives.

97. Plaintiff and Class members have routinely performed that necessary work without pay as a structural feature of Mercor's system.

98. Plaintiff personally performed compensable Mercor work off Insightful, including brainstorming and grading and trajectory work that Mercor's policy excluded from logged hours. Mercor knew or should have known that workers regularly performed this work because Mercor created the policies that required it.

99. On information and belief, Plaintiff alleges that Mercor maintains internal Slack messages, project guidance documents, and trainer materials confirming that workers are required to perform brainstorming, grading, trajectory, and task-preparation work outside compensable Insightful time.

100. Mercor knew or should have known about the off-Insightful work because Mercor itself instituted the policy that excludes that work from compensable hours.

**I. Mercor's Mandatory Insightful Surveillance**

101. Every Mercor "contractor" performing hourly work is required, as a condition of receiving any payment for hourly work, to install and run an invasive screen-monitoring application called Insightful (formerly known as Workpuls). Mercor's documentation provides: "Is it allowed to work without Insightful access?

No. You must not begin working or logging hours until Insightful access is confirmed."[9]

102. Insightful captures screenshots of workers' computer screens as frequently as every minute throughout the active workday. Insightful additionally captures application usage, idle/active status, and other metadata sufficient to permit Mercor to monitor the contractor's computer activity throughout the work session.

103. Insightful contains a timer that automatically pauses upon detecting a period of inactivity. The auto-pause functionality is itself a control device: it permits Mercor to require its workforce to be continuously productive at the keyboard, and to dock pay for any pause.

104. Mercor uses the Insightful data not only to validate logged hours but also to manage performance, audit work product, and determine eligibility for continued engagement.

### J. Mercor Trains, Supervises, and Disciplines Its Workforce

105. Mercor mandates onboarding training for every worker on every project. Mercor's documentation describes onboarding sessions as "critical" and warns that "missing an onboarding session may impact your ability to proceed with the project."[10] Workers receive project specific instructions, scoring rubrics, and quality standards through Mercor or its clients.

---

[9] *See* Mercor, *Project and Onboarding Support FAQ — Is it allowed to work without Insightful access?*, https://talent.docs.mercor.com/support/project (last visited May 8, 2026).
[10] *See* Mercor, *Project and Onboarding Support FAQ — What should be done if an onboarding call was missed?*, https://talent.docs.mercor.com/support/project (last visited May 8, 2026).

106. Mercor subjects the workers' work product to layered quality control. Tasks are reviewed by Mercor or its clients' personnel, with feedback delivered through the Mercor platform or other Mercor-designated tools. Quality thresholds are calculated using "project specific evaluation criteria" that consider "the total number of reviewed tasks, negative ratings, and approved disputes."[11] Failing tasks may be returned for rework. Higher quality task performance is rewarded with higher per-task pay rates, creating a performance hierarchy.

107. Workers who fall below project-defined quality thresholds are subjected to what Mercor itself terms "performance offboarding." That mechanism functions as a progressive-discipline regime customarily applied to employees.

108. Mercor even goes so far as to regulate workers' outside speech regarding their Mercor work. Mercor's Social Media and Internet Use Policy permits workers to describe their Mercor work on professional platforms only "at a high level" and only in compliance with Mercor's rules; contractors may not list a Mercor client as their employer, may not imply full-time employment, and may not share screenshots, examples, or content that could compromise project or client confidentiality.

**K. Plaintiff's Engagement**

109. Plaintiff's engagement with Mercor exemplifies the misclassification at issue. Plaintiff began performing services for Mercor in approximately October

[11] *See* Mercor, *Project and Onboarding Support FAQ — How is the minimum task quality threshold calculated?*, https://talent.docs.mercor.com/support/project (last visited May 8, 2026).

2025. She has performed subject-matter-expert evaluation and peer-review work and continues to do so.

110. Plaintiff has been compensated both on an hourly basis (with hours validated through Insightful) and on a per-task basis. The hourly rate paid to Plaintiff was set unilaterally by Mercor and was not negotiable. The per-task rate was uniform across all contractors performing the same task. The project price was set by Mercor.

111. Plaintiff installed and ran the Insightful application as a condition of being paid for hourly work. Insightful captured screenshots of her screen approximately every minute during her active work, monitored her keyboard and mouse activity, and auto-paused upon detecting inactivity. Mercor required her to use her own personal laptop. Mercor did not reimburse her for her laptop, internet, or software costs.

112. Plaintiff has personally performed compensable work for Mercor off Insightful. Mercor's policy did not permit Plaintiff to log time spent on activities such as brainstorming task approaches and running grading and trajectory work to validate her outputs (in plain terms, applying Mercor's grading rubric to her own draft answers, and tracing the step-by-step reasoning, or "trajectory," of model responses she was reviewing, in order to confirm that her outputs satisfied Mercor's quality standards before submission), even though those activities were necessary to perform the tasks Mercor assigned. Mercor knew about these activities because Mercor itself imposed the policies that required them.

113. Mercor required Plaintiff to submit a weekly availability questionnaire indicating her availability and intended hours for each project. Each project had a Mercor-imposed weekly hour expectation. Mercor required notice if Plaintiff would be unavailable or working reduced hours. Mercor sent her work back through layered quality control review, and her per-task compensation rate depended on her quality scores.

114. Plaintiff also held primary, full-time employment with an unrelated employer during the relevant period. That fact does not defeat employee status as to Mercor. With respect to her Mercor work, Plaintiff was not operating an independent business: she did not market services to the public, had no business entity, no Employer Identification Number, and no business insurance, and Mercor was her only purported independent-contractor engagement during that period. Those facts bear directly on the "independent business" factor under the federal common-law agency test articulated in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992).

115. Plaintiff alleges on information and belief, subject to discovery from Mercor's Insightful and payroll records, that her Mercor engagement is continuing and that she is accruing hours of service toward elective-deferral eligibility under the long-term part-time employee rule.

116. That rule, reflected in 26 U.S.C. § 401(k)(2)(D)(ii), subject to 26 U.S.C. § 401(k)(15), and ERISA § 202(c), 29 U.S.C. § 1052(c)(1)(B), requires covered 401(k) plans, for plan years beginning after December 31, 2024, to permit elective deferrals

by a common-law employee who completes at least 500 hours of service in each of two consecutive 12-month periods and satisfies the minimum age requirement.

117. Plaintiff began working for Mercor on October 6, 2025. She has not yet completed two consecutive 12-month periods as of this filing. She satisfies the minimum age requirement and has worked more than 500 hours during the 12-month period beginning October 6, 2025.

118. Plaintiff therefore seeks clarification of her service credit, elective-deferral eligibility, and future rights as a continuing common-law employee accruing service toward the two-period threshold. She does not seek immediate enrollment as a presently vested LTPT participant.

119. Mercor issued Plaintiff a Form 1099-NEC for tax year 2025 reporting her pay as nonemployee compensation. Plaintiff paid self-employment tax on that amount, including the employer equivalent burden shifted to her by Mercor's classification decision.

**L. Mercor's Misclassification Scheme and Its Economic Effects**

120. By classifying Plaintiff and the Class as independent contractors, Mercor avoided substantial costs that employers ordinarily bear.

121. Those avoided costs include the employer's 6.2% Social Security contribution under 26 U.S.C. § 3111(a), the employer's 1.45% Medicare contribution under 26 U.S.C. § 3111(b), federal unemployment tax, Texas unemployment tax, workers' compensation premiums, and employer-provided benefits.

122. Mercor offers generous and valuable benefits to workers it classifies as employees, including health insurance, "equity grants," a monthly meal stipend,

generous "proximity" bonuses for workers who live near the physical office, free memberships to Equinox gym, unlimited paid vacation and sick days, a 401(k) plan with employer match, parental leave, a monthly "wellness" stipend, and free mental health services.

123. The economic injuries of Plaintiff and the Class are addressed in the Counts that follow. They include excess self-employment tax, lost benefits and service credit under any ERISA plan Mercor maintains, and unpaid compensation for hours Mercor deducted from Insightful time or required to be worked outside Insightful.

124. Mercor's misclassification also imposed related burdens, including 1099-NEC tax reporting, self-employment filings, potential amended returns if reclassification is ordered, and expenses an employer would ordinarily provide or reimburse. Those harms are pleaded as recoverable only to the extent authorized by the specific Counts below.

125. Mercor confirms its non-withholding position on its public legal support page: "Mercor does not withhold any taxes. You are responsible for reporting and paying your own taxes in accordance with your local laws."[12]

126. Mercor has also avoided the recordkeeping, withholding, and reporting obligations imposed on employers under federal and Texas law, and has filed Forms 1099-NEC reporting Plaintiff's and the Class's compensation as nonemployee

[12] *See* Mercor, *Legal Support*, https://talent.docs.mercor.com/support/legal (last visited May 8, 2026).

compensation rather than the Forms W-2 that proper classification would have required.

127. Mercor's misclassification of Plaintiff and the Class as independent contractors was knowing and willful.

128. Mercor is a sophisticated $10 billion company with access to legal and tax advice. Its Worker Agreement recites that the work is outside Mercor's usual course of business, even though supplying that work to AI developers is unquestionably Mercor's core business.

129. Mercor's Worker Invention Assignment Agreement also anticipates the possibility that a court could determine that the worker is an employee despite the agreement's contractor label. Mercor proceeded anyway.

130. Mercor's public client-facing materials are even more direct. Mercor tells clients that engaging Mercor helps avoid "worker misclassification risk," including penalties and legal action. Mercor thus knew the risk existed and chose the challenged classification model anyway.

131. Mercor's public "US | 1099 vs. W2 Work" page confirms the categorical nature of the policy. Mercor states that it "does not offer W2 positions," that work through Mercor is "not considered employment," and that Mercor provides a Form 1099-NEC at year end.[13]

**M. Plaintiff's Out-of-Pocket Tax Harm**

[13] *See* Mercor, *US | 1099 vs. W2 Work*, https://talent.docs.mercor.com/policies/us-1099-vs-w2 (last visited May 8, 2026).

132. Plaintiff personally suffered out-of-pocket harm from Mercor's misclassification.

133. Her principal pleaded injuries include: the additional self-employment tax she paid; tax preparation costs incurred to handle 1099-NEC reporting and Schedule C and Schedule SE filings; unpaid compensation for Insightful time Mercor deducted and, in the alternative, for necessary off-Insightful work; and lost benefits, eligibility, service credit, or accrual rights under any ERISA plan Mercor maintains.

134. Plaintiff has also experienced related consequences, including the potential need to amend federal tax returns if reclassification is ordered and the assumption of computer, internet, and supply costs that an employer would ordinarily provide or reimburse. Plaintiff pleads these consequences as background context only. Plaintiff does not seek monetary recovery for them except to the extent recovery is authorized by a specific Count below.

135. Class members suffered analogous harm. The amount owed to each member can be calculated from Mercor's Insightful records, payout records, contracts, and plan records, together with each member's tax filings and standard payroll tax rules. Plan-related amounts can be calculated once Mercor produces the governing plan documents.

## CLASS ACTION ALLEGATIONS

136. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class and Subclasses.

137. As used in this Complaint, "Mercor's platform or project systems" includes Mercor-issued or Mercor-controlled accounts, credentials, tools, workspaces, payment systems, timekeeping systems, project dashboards, Mercor email, Okta credentials, Slack workspaces, Insightful accounts, Stripe or Wise payment accounts, and task queues through which Mercor assigned, tracked, reviewed, paid, or managed work.

> **Nationwide Class:** All persons in the United States who, at any time from January 1, 2024 through the date of class certification, performed paid AI training, data labeling, evaluation, model review, safety review, coding tasks, expert consultations, or related project work through Mercor's platform or Mercor project systems, and whom Mercor treated as nonemployee contractors for payroll, tax, or personnel record purposes, including by issuing or maintaining records reflecting Form 1099-NEC or nonemployee-compensation treatment.

> **Texas Subclass:** All members of the Nationwide Class who resided in Texas or performed services for Mercor in Texas at any time during the class period.

> **Audit-Deduction Subclass:** All members of the Nationwide Class for whom, at any time during the class period, Mercor's logged-time and payout records reflect that Mercor deducted, before payout, hours the worker had logged on the Insightful timekeeping application.

> **Off-Insightful Policy Subclass:** All members of the Class who, at any time during the class period, were assigned to one or more Mercor projects whose project policies, project instructions, training materials, or Mercor-administered Slack communications instructed workers to perform preparatory, brainstorming, grading, trajectory-review, or similar project work outside the Insightful timekeeping application.

> **Section 7434 Subclass:** All members of the Class for whom Mercor filed a Form 1099-NEC reporting nonemployee compensation for paid work performed through Mercor's platform or Mercor project systems for any tax year from 2024 through the date of class certification.

> **Current-Worker Injunctive Subclass:** All members of the Class who, as of the date of class certification, remained engaged by Mercor as purported independent contractors. This subclass is asserted under

Federal Rule of Civil Procedure 23(b)(2) solely for prospective declaratory and injunctive relief addressed to Mercor's administration of any ERISA-governed employee benefit plan it maintains, including the crediting of service, the determination of plan eligibility, and the application of accrual and elective-deferral rules to current Subclass members. The subclass does not seek, and Plaintiff disclaims on its behalf, any individualized monetary relief, any relief whose direct or principal effect would be to determine federal tax liability, and any broader injunction against Mercor's use of the independent-contractor classification outside the ERISA plan administration context.

**Excluded from the Nationwide Class and from each of the Texas Subclass, the Audit-Deduction Subclass, the Off-Insightful Policy Subclass, the Section 7434 Subclass, and the Current-Worker Injunctive Subclass are:**

(a) Defendant and its officers and directors;

(b) any entity in which Defendant has a controlling interest;

(c) Defendant's legal representatives, successors, and assigns;

(d) professional-service vendors, business entities, and similarly situated outside vendors that did not perform paid project work through Mercor's platform or Mercor project systems;

(e) the judicial officers assigned to this matter and members of their immediate families and associated court staff; and

(f) any individual who has executed a valid and enforceable release of the claims asserted herein.

### A. Rule 23(a) Requirements

138. **Numerosity (Rule 23(a)(1))**: The Class is so numerous that joinder is impracticable. Mercor publicly reports a roster and network of more than 30,000 "experts." On information and belief, the Class includes tens of thousands of workers nationwide. Mercor's CEO stated publicly on May 4, 2026 that Mercor had "just hired 10,000 people in 4 days," confirming the scale and speed of Mercor's class-period engagements.

139. **Commonality (Rule 23(a)(2))**: Common questions of law and fact include whether Mercor exercised control sufficient to make Plaintiff and the Class common-law employees; whether their work was integral to Mercor's business; whether Mercor's pay setting, time tracking, quality review, and discipline practices were uniform; whether Mercor knowingly filed Forms 1099-NEC reporting employee wages as nonemployee compensation; whether Mercor breached its agreements by failing to pay for work performed; whether Mercor was unjustly enriched; whether Mercor maintains ERISA-governed plans in which the workers would have participated as employees; and the proper measure of relief.

140. **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the Class. Like other Class members, Plaintiff performed paid work through Mercor's platform or project systems, was labeled an independent contractor, was subject to Mercor's control over hours, pay, timekeeping, and performance, and received a Form 1099-NEC reporting her pay as nonemployee compensation.

141. Plaintiff suffered the same kinds of harm as other Class members, including the payment of self-employment tax above the employee-side FICA amount, unpaid work, and lost plan-related rights.

142. Although Plaintiff began working for Mercor in October 2025, the challenged practices were materially uniform across the class period. Insightful time logging and deductions applied to hourly workers; per-task pricing and quality review applied to per-task workers; and Mercor's contractor classification and Form 1099-NEC reporting applied across the workforce.

143. **Adequacy (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of the Class, and Plaintiff has no interests antagonistic to or in conflict with the Class. Plaintiff has retained counsel experienced in complex civil litigation in the Northern District of Texas.

**B. Rule 23(b) Requirements**

144. **Predominance (Rule 23(b)(3))**: Common questions of law and fact predominate over any questions affecting only individual members of the Class. The fundamental question, whether Mercor's contractor workforce was misclassified, can be resolved on a classwide basis using common evidence: Mercor's standard onboarding process, its Mercor project systems, its uniform pay setting practices, its uniform deployment of Insightful, its uniform quality control regime, and its uniform issuance of Forms 1099-NEC.

145. Damages are susceptible to common, formulaic proof. The excess self-employment tax paid by a worker can be calculated using reported 1099-NEC compensation, federal payroll tax rules, the Social Security wage base, and applicable tax adjustments.

146. Plan-related benefits, service credit, employer matching contributions, nonelective contributions, and other accrued benefits can be calculated from Mercor's plan terms, eligibility provisions, pay history, and service records, subject to the limits and equitable predicates pleaded in Count V.

147. Unpaid Insightful time and off-Insightful work can be calculated from Mercor's Insightful logs, payout records, rate cards, project policies, and

communications, supplemented as appropriate by representative evidence. Each category of damages traces to Mercor's challenged classification and pay practices through common proof.

148. **Superiority (Rule 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation would be impracticable given the number of affected workers, the modest individual stakes relative to the cost of litigation, and the imbalance between Mercor's resources and any individual worker's resources.

149. **Injunctive and Declaratory Relief (Rule 23(b)(2))**: For the Current-Worker Injunctive Subclass, Mercor has acted on grounds that apply generally to the Subclass. Final declaratory and injunctive relief is therefore appropriate as to the Subclass as a whole.

150. Plaintiff seeks, for that Subclass only, a declaration that current Subclass members are common-law employees for purposes of administering any ERISA plan Mercor maintains, and a prospective order requiring Mercor to credit the service, eligibility, and accrual time to which they are entitled under those plans.

151. That relief is prospective, plan administration relief. It is not a request for individualized monetary relief or a request to determine federal tax liability.

## CAUSES OF ACTION

### Count I: Declaratory Judgment

28 U.S.C. §§ 2201–2202

152. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

153. An actual case or controversy exists between Plaintiff and the Class on the one hand, and Mercor on the other, concerning the legal status of the working relationship between them. Mercor contends that Plaintiff and the Class are independent contractors. Plaintiff contends that, as a matter of common-law agency and control under applicable law, she and the Class are common-law employees of Mercor.

154. Under the federal common-law agency test, the central question is Mercor's right to control the manner and means of the work. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992). Relevant factors include skill, tools, location, duration, assignment of additional work, schedule control, method of payment, the worker's ability to hire assistants, whether the work is part of the hiring party's regular business, benefits, and tax treatment.

155. Those factors support employee status here. Mercor controls the work through Insightful monitoring, project rubrics, required systems, layered review, performance scoring, and offboarding.

156. The work is skilled, but the workers apply that skill within Mercor's production process. Mercor supplies the platform, accounts, credentials, Slack workspaces, project specifications, and training. The workers supply only ordinary personal devices and internet access.

157. The relationship is continuing, not a one-off engagement. Mercor assigns additional projects through its platform. Workers have limited discretion over when and how long to work because Mercor sets caps, requires availability reporting, pauses projects, and controls access to tasks.

158. Mercor sets hourly and per-task pay, pays weekly through Stripe or Wise, bars subcontracting and assistants, and supplies labor as its regular business. Mercor also treats its employee workforce differently for benefits and tax reporting. On the pleaded facts, Plaintiff and the Class are common-law employees.

159. Plaintiff seeks a declaration that Plaintiff and the Class are common-law employees of Mercor solely for purposes of resolving Count V under ERISA.

160. Plaintiff also seeks, for the Current-Worker Injunctive Subclass only, prospective relief requiring Mercor to administer any ERISA plan it maintains by crediting current Subclass members with the service, eligibility, and accrual time to which they are entitled as common-law employees.

161. This Count does not seek a tax declaration. Any worker status finding required for Count II is an element of the § 7434 claim, not independent declaratory relief under 28 U.S.C. § 2201. Plaintiff disclaims any declaration whose direct or principal effect would be to determine federal tax liability or compel assessment, collection, or refund of federal tax.

## **Count II: Fraudulent Filing of Information Returns**

26 U.S.C. § 7434

162. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

163. 26 U.S.C. § 7434(a) provides: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return."

164. For tax year 2025, Mercor filed with the IRS and furnished to Plaintiff a Form 1099-NEC reporting $6,638.00 in compensation as "nonemployee compensation" in Box 1. The form identified Mercor as payer and Plaintiff as recipient at her Tom Green County, Texas address.

165. Plaintiff received the form before the February 2, 2026 recipient-statement and IRS-filing deadlines applicable to 2025 Forms 1099-NEC. The statutory January 31, 2026 deadline fell on a Saturday.

166. On information and belief, Mercor filed analogous Forms 1099-NEC for members of the Section 7434 Subclass for tax year 2025 and earlier years within the limitations period.

167. Each such Form 1099-NEC was a fraudulent information return within the meaning of 26 U.S.C. § 7434(a) because it materially misstated the legal character of the payments: the payments constituted employee wages required to be reported on Form W-2, not nonemployee compensation properly reportable on Form 1099-NEC. The correct amount reportable as nonemployee compensation on Form 1099-NEC for Plaintiff for tax year 2025 was therefore $0; the $6,638.00 Mercor paid to Plaintiff for 2025 should have been reported as wages on Form W-2.

168. Plaintiff alleges on information and belief that the same wrong form correction applies to each Section 7434 Subclass member: the correct amount reportable as nonemployee compensation on Form 1099-NEC for each such member was $0, and the gross compensation Mercor paid was reportable, if at all, as wages on Form W-2 for the applicable tax year.

169. Mercor's wrong form filing also misstated the "payments purported to be made" within the meaning of § 7434(a).

170. Plaintiff and the Section 7434 Subclass seek the statutory minimum damages of $5,000 per return as well as actual damages, including tax preparation costs caused by 1099-NEC reporting and self-employment tax filings. Plaintiff's actual damages include the incremental software cost required to prepare Schedule C and Schedule SE filings; other Subclass members may have analogous or larger paid-preparer costs.

171. Plaintiff does not seek to recover unpaid hours or employer payroll taxes under § 7434. Those theories are pleaded under Counts III, IV, and V.

172. Mercor's filing was willful. Willfulness under § 7434 includes knowing conduct or reckless disregard of the law.

173. Mercor is a sophisticated $10 billion company with access to specialized legal and tax counsel. Its own agreements anticipate the possibility that a court may find an employment relationship despite the contractor label. Its client-facing materials identify worker misclassification risk. And Mercor nonetheless filed Forms 1099-NEC treating employee wages as nonemployee compensation.

174. Plaintiff and the members of the Section 7434 Subclass are entitled to the greater of (i) $5,000 or (ii) the sum of the actual damages sustained by Plaintiff and each Subclass member as a proximate result of the fraudulent filing, the costs of this action, and, in the Court's discretion, reasonable attorneys' fees, pursuant to 26 U.S.C. § 7434(b).

175. Plaintiff will provide a copy of this Complaint to the Internal Revenue Service in accordance with 26 U.S.C. § 7434(d).

176. Plaintiff requests that the Court make the finding required by 26 U.S.C. § 7434(e) of the correct amount that should have been reported on Plaintiff's and each Subclass member's information returns.

## Count III: Breach of Express Contract

(On behalf of the Audit-Deduction Subclass and, in the alternative, the Off-Insightful Policy Subclass under Delaware law, and in the alternative on behalf of the Texas Subclass under Texas law)

177. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

178. Plaintiff and members of the Audit-Deduction Subclass and Off-Insightful Policy Subclass entered written contracts with Mercor: the Worker Agreement, the Worker Invention Assignment Agreement, and project terms communicated through Mercor's platform, including rates and assigned work.

179. The Worker Agreement contains a Delaware governing-law clause. Plaintiff pleads this Count under Delaware law to the extent the clause is enforceable and applies. In the alternative, Plaintiff pleads under Texas law for herself and the Texas Subclass to the extent Texas law governs.

180. Plaintiff and the members of the Audit-Deduction Subclass and the Off-Insightful Policy Subclass, and in the alternative Plaintiff and the Texas Subclass, fully performed their obligations under those agreements, including by performing the services Mercor assigned, complying with Mercor's reporting and time tracking requirements, and abiding by Mercor's policies.

181. Mercor breached those agreements by deducting compensable Insightful-logged hours from Plaintiff's and the Audit-Deduction Subclass's payouts, even though the hours reflected productive Mercor-assigned work and were logged through Mercor's required timekeeping tool.

182. In the alternative, Mercor breached by requiring Plaintiff and the Off-Insightful Policy Subclass to perform compensable work outside Insightful, including brainstorming, grading, trajectory validation, and other necessary preparatory or review work, while refusing to pay for that time.

183. Section 3 of the Worker Agreement provides that, as consideration for the services, Mercor will pay the worker an agreed rate under payment terms communicated before the work begins. Section 1 defines the services to include the work necessary to complete agreed projects and deliver the specified results. Mercor communicated those payment terms through offer letters that set an hourly rate of pay for the engagement, including offer letters issued to Plaintiff stating an "Hourly Pay Rate" and a rate of "$70.00 USD per hour." Mercor's platform terms conditioned payment on time logged through the Mercor-required Insightful timekeeping tool,

making time logged in Insightful the agreed measure of the compensation due for hours worked.

184. Read together, those provisions required Mercor to pay the agreed rate for compensable Mercor-assigned work. For the Audit-Deduction Subclass, the parties' logging condition was satisfied when workers recorded the time in Insightful.

185. As to the audit and deduction theory, Plaintiff and the Audit-Deduction Subclass complied with Mercor's logging condition by recording their time through Insightful. Mercor then unilaterally subtracted hours from payout under criteria Mercor alone selected.

186. Under Delaware law, the implied covenant of good faith and fair dealing forbids a party with discretion over payment calculation from exercising that discretion to defeat the other party's reasonable expectations or deprive the other party of the benefit of the bargain. Mercor's audit-and-deduction practice violated that covenant.

187. In the alternative, if Mercor contends that its payment terms excluded work performed outside Insightful, Mercor still breached. Mercor directed Plaintiff and the Off-Insightful Policy Subclass to perform integral preparatory and review work outside the Insightful window, accepted the resulting work, and sold it to clients.

188. A party cannot enforce a payment condition when its own conduct prevented or hindered satisfaction of that condition. By directing the work and

accepting the deliverables, Mercor also waived strict adherence to any Insightful-only logging condition for that work.

189. Any ambiguity in whether "Fees" for "Services" includes the time necessary to complete assigned projects must be construed against Mercor. To the extent Texas law applies, the prevention and waiver principles pleaded in this paragraph are supported by Texas law. The implied-covenant theory is asserted only under Delaware law.

190. The value of the unpaid work is calculable from Mercor's own records. Those records include Insightful logs, weekly deduction records, Stripe and Wise payout records, project policies, rate cards, Slack communications, and dashboard communications.

191. Plaintiff's own pay records, Insightful records, Slack messages, and project communications reflect the same audit deduction and off-Insightful patterns.

192. Plaintiff has not pleaded specific dates, projects, rates, or dollar amounts in this public Complaint to preserve a streamlined record. The exact project names, dates, rates, and dollar amounts are reflected in Mercor's records and will be supplied through discovery or, if necessary, under seal. Plaintiff reserves the right to plead further specifics as appropriate.

193. As a direct and proximate result of these breaches, Plaintiff and the members of the Audit-Deduction Subclass and the Off-Insightful Policy Subclass, and in the alternative Plaintiff and the Texas Subclass, have suffered actual damages in the form of unpaid compensation owed under the parties' express agreements.

Plaintiff and those Subclass members are entitled to recover those damages, plus prejudgment and post-judgment interest at the maximum rate allowed by law. To the extent Texas law governs Plaintiff's contract claim on behalf of the Texas Subclass, Plaintiff and the Texas Subclass also seek attorneys' fees and costs as permitted by Tex. Civ. Prac. & Rem. Code § 38.001.

**Count IV: Unjust Enrichment**

(On behalf of the Texas Subclass; in the Alternative)

194. Plaintiff incorporates by reference all preceding paragraphs. Plaintiff pleads this Count for the Texas Subclass in the alternative to Count III, to the extent the Court determines that the express agreements do not govern some portion of the alleged harms.

195. Plaintiff invokes Texas unjust enrichment law because she resides in Texas, performed services in Texas, received payment in Texas, and entered the Mercor agreements while in Texas. Plaintiff reserves the right, after discovery, to seek certification of additional state-law subclasses or to plead an appropriate choice-of-law basis for broader unjust-enrichment relief.

196. Plaintiff and the Texas Subclass conferred a benefit on Mercor by performing valuable labor for Mercor and its corporate clients, including labor performed off the Insightful timekeeping tool that Mercor refused to compensate.

197. Mercor knowingly accepted and retained the benefit of that labor without paying for it. The principal retained benefit is the value of the labor itself: Mercor accepted preparatory and review work, incorporated it into deliverables sold to clients, and did not pay the workers for the corresponding time.

198. In the alternative, Mercor also retained the value of the employer Social Security and Medicare contributions it would have paid under 26 U.S.C. § 3111(a)–(b) had it classified Plaintiff and the Texas Subclass as employees. Because Mercor used Forms 1099-NEC, Plaintiff and the Texas Subclass instead bore that employer equivalent burden through self-employment tax.

199. Plaintiff acknowledges that any employee-side Social Security and Medicare amounts may be administratively recoverable through Form 8919 or comparable mechanisms. The restitution measure pleaded here is limited to the employer equivalent amount Plaintiff and the Texas Subclass paid out of pocket, and is pleaded only in the alternative to, and only to the extent not duplicative of, restitution for uncompensated labor.

200. Plaintiff and the Texas Subclass personally bore those harms. They include unpaid compensation for Insightful time Mercor deducted, unpaid compensation for necessary off-Insightful work, and, in the alternative or as an additional nonduplicative equitable measure, the employer equivalent Social Security and Medicare amounts shifted to them through self-employment tax.

201. Tax preparation costs are pleaded as actual damages under Count II. Unreimbursed business expenses are pleaded, to the extent recoverable, as misclassification-related injury supporting the ERISA and contract claims rather than as restitution under this Count.

202. It would be unjust for Mercor to retain those benefits. The unpaid Insightful time and the off-Insightful preparatory and review work were necessary to produce work Mercor accepted and sold to its clients.

203. Plaintiff and the Texas Subclass are entitled to restitution principally measured by the value of uncompensated labor. In the alternative, and only to the extent not duplicative, they are entitled to restitution measured by the employer equivalent Social Security and Medicare amounts Mercor would have remitted under 26 U.S.C. § 3111(a)–(b).

**Count V: Claim For Benefits Under ERISA § 502(A)(1)(B);**
**In the Alternative, Equitable Relief Under ERISA § 502(A)(3)**

29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3)

204. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

205. On information and belief, Mercor maintains one or more employee benefit plans governed by ERISA. Mercor's careers page represents that "US full-time employees are eligible for," among other benefits, a 401(k) plan with an employer match.

206. Plaintiff alleges on information and belief that Mercor maintains and administers a 401(k) plan that is an employee pension benefit plan under 29 U.S.C. § 1002(2)(A). Plaintiff also alleges in the alternative that Mercor maintains one or more group health, mental-health, or other welfare plans governed by ERISA.

207. The precise plan terms are presently unknown to Plaintiff. Plaintiff pleads this Count subject to amendment after production of plan documents

requested under 29 U.S.C. § 1024(b)(4). As of the date of this First Amended Complaint, Mercor has not produced those documents, the statutory response period having expired without any response, as further alleged below.

208. Plaintiff acknowledges that ERISA does not require every common-law employee to be covered by every plan, and that plan terms generally control eligibility. Plaintiff therefore pleads in the alternative.

209. If Mercor's plan terms extend eligibility to common-law employees, including workers misclassified as contractors, Plaintiff and the Class are entitled to benefits under § 502(a)(1)(B). If the plan terms purport to exclude common-law employees through a contractor or classification-based exclusion, Plaintiff seeks equitable relief under § 502(a)(3) only to the extent discovery shows fiduciary breach, fraud, mistake, inequitable conduct, a plan document/SPD mismatch, or fiduciary misrepresentation concerning eligibility.

210. Plaintiff has standing to bring this Count as a "participant" within the meaning of 29 U.S.C. § 1002(7) because she has a colorable claim to benefits, eligibility, service credit, and future benefits under the 401(k) Plan and any other ERISA-governed plan Mercor maintains, as a common-law employee of Mercor. Plaintiff and the Class are common-law employees of Mercor and would have qualified, or would qualify upon satisfaction of the plan's eligibility terms, for participation in Mercor's ERISA-governed 401(k) Plan but for Mercor's misclassification of them as independent contractors.

211. Plaintiff also invokes the long-term part-time employee (LTPT) rule as an independent path to elective-deferral eligibility and service credit.

212. For plan years beginning after December 31, 2024, 26 U.S.C. § 401(k)(2)(D)(ii), subject to 26 U.S.C. § 401(k)(15), and ERISA § 202(c), 29 U.S.C. § 1052(c)(1)(B), require covered 401(k) plans to permit elective deferrals by a common-law employee who completes at least 500 hours of service in each of two consecutive 12-month periods and satisfies the minimum age requirement.

213. Plaintiff is over age twenty-one. She began working for Mercor on October 6, 2025, has worked more than 500 hours during the 12-month period beginning on that date, and continues to accrue service toward the two-period threshold.

214. Plaintiff does not seek immediate enrollment as a presently vested LTPT participant. She seeks clarification of her service credit, elective-deferral eligibility, and future rights as a continuing common-law employee accruing service toward the statutory threshold. Such relief is expressly authorized by ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which permits a participant to bring a civil action "to clarify his rights to future benefits under the terms of the plan," and is independent of any claim to recover benefits presently due.

215. Plaintiff acknowledges that 26 U.S.C. § 401(k)(15)(B) permits a plan to exclude employees eligible solely through the LTPT rule from employer matching and nonelective contributions. The LTPT theory is therefore directed to elective-deferral eligibility, service credit, and future rights. Plaintiff and Class members seek

employer matching or nonelective contributions only to the extent they independently qualify under the plan's general eligibility terms or satisfy the equitable predicates pleaded here.

216. Plan exhaustion is unavailable, futile, or excused.

217. First, exhaustion is unavailable in fact. Mercor has not identified to Plaintiff the ERISA plans it maintains, the plan administrators, the summary plan descriptions, the plan instruments, or the claim procedures needed to invoke an administrative process.

218. Plaintiff's pre-suit search of the Department of Labor's EFAST2 Form 5500 database identified no Form 5500 annual report filed under Mercor.io Corporation's name or under its federal employer-identification number ending in -1971. That is consistent with a newly established plan, a third-party administrator or professional employer organization filing under another EIN, or a plan not yet at its first public disclosure deadline.

219. On May 7, 2026, Plaintiff's counsel served Mercor with a written request under 29 U.S.C. § 1024(b)(4) by certified mail (USPS Tracking No. 9414 8118 9876 5524 5068 41), addressed to "Mercor.io Corporation dba Mercor, Plan Administrator, 181 Fremont Street, 33rd Floor, San Francisco, CA 94105," requesting the latest summary plan description, plan instrument, trust agreement, Form 5500, and other instruments under which Mercor's ERISA plans are established or operated, including the 401(k) plan referenced on Mercor's careers page. The thirty-day

statutory response period under 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1) expired on June 10, 2026, and Mercor produced nothing and did not respond in any manner.

220. Until Mercor identifies the plans, administrators, and claim procedures, Plaintiff has no administrative process to exhaust. Mercor has identified no plan, plan administrator, or claims procedure, whether in response to Plaintiff's § 1024(b)(4) request or otherwise, and the statutory period for doing so has now passed.

221. Second, exhaustion would be futile. Mercor has consistently told Plaintiff and the Class, through its Worker Agreement, Forms 1099-NEC, and course of dealing, that they are independent contractors and not eligible for employee benefits. Mercor's offer letters state expressly that, as an independent contractor, the worker is "not entitled to any of the benefits that Mercor or our client provides to its employees, including but not limited to health insurance, paid leave, or retirement plans." Mercor's public "US | 1099 vs. W2 Work" policy likewise states that Mercor "does not offer W2 positions." Mercor's position that its workers are not employees and not eligible for benefits is categorical and uniform, so any administrative claim for benefits would be futile.

222. Third, Mercor is estopped from asserting failure to exhaust to the extent its own conduct misled Plaintiff and the Class about their eligibility.

223. Plaintiff alleges on information and belief that Mercor, a plan administrator, a benefits committee, or another person Mercor designates or controls exercised discretionary authority or control over the management or administration of Mercor's ERISA plans.

224. That discretionary authority includes eligibility determinations, communications about eligibility and participation, enrollment processes, claim procedures, and the calculation and crediting of service.

225. To the extent any such person is an ERISA fiduciary under 29 U.S.C. § 1002(21)(A), Plaintiff's § 502(a)(3) claim addresses fiduciary conduct, not settlor plan design.

226. Under 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks benefits due under the terms of any ERISA plan Mercor maintains, including service credit and elective-deferral eligibility under the plan's general terms or the LTPT path, as applicable.

227. Where plan terms and equitable predicates permit, Plaintiff also seeks the value of employer matching contributions, nonelective contributions, and other benefits or accrued service to which she and Class members would have been entitled. Plaintiff does not seek employer matching or nonelective contributions based solely on LTPT eligibility.

228. In the alternative, if benefits are unavailable under § 1132(a)(1)(B), Plaintiff seeks appropriate equitable relief under § 1132(a)(3), including reformation, equitable estoppel, and surcharge where the evidence supports those remedies.

229. Pursuant to ERISA § 502(h), 29 U.S.C. § 1132(h), Plaintiff will cause a copy of this Complaint to be served upon the Secretary of the Treasury and the Secretary of Labor by certified mail in connection with the claims pleaded in this Count, except as the same may be limited by the proviso to § 502(h) for actions seeking relief solely under § 502(a)(1)(B).

## Count VI: Statutory Penalties Under ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1)

230. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

231. On May 7, 2026, Plaintiff, through counsel, served a written request under 29 U.S.C. § 1024(b)(4) on Mercor's plan administrator, addressed to "Mercor.io Corporation dba Mercor, Plan Administrator, 181 Fremont Street, 33rd Floor, San Francisco, CA 94105," requesting, as to each ERISA-governed employee benefit plan Mercor maintains, the latest summary plan description and summaries of material modifications; the most recent plan instrument or contract, including the 401(k) plan document, adoption agreement, and basic plan document; the most recent trust agreement or other instrument under which the plan is established or operated; the most recent Form 5500 annual report with schedules and audit reports; any collective-bargaining agreement; and any other instrument under which a plan is established or operated.

232. The request was sent by certified mail, USPS Tracking No. 9414 8118 9876 5524 5068 41, and the United States Postal Service confirmed delivery to Mercor's principal place of business on May 11, 2026 at 2:42 p.m.

233. Under 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1), Mercor's plan administrator was obligated to furnish the requested documents within thirty days of the request. The thirty-day period expired on Wednesday, June 10, 2026.

234. As of the date of this First Amended Complaint, Mercor has failed or refused to furnish any of the requested documents, to identify any plan it maintains, or to respond in any manner.

235. Mercor is the "administrator" of its ERISA-governed plans within the meaning of 29 U.S.C. § 1002(16)(A). On information and belief, no plan instrument disclosed to participants designates a different administrator; in the absence of a designation, the plan sponsor is the administrator by operation of law. 29 U.S.C. § 1002(16)(A)(ii). Plaintiff's request expressly invited Mercor to identify any other person it contends is the administrator, and Mercor identified no one.

236. Plaintiff is a "participant" within the meaning of 29 U.S.C. § 1002(7) for the reasons alleged above in Count V: as a common-law employee of Mercor, she has a colorable claim to benefits, eligibility, service credit, and future benefits under Mercor's ERISA-governed plans.

237. Mercor's failure to respond within thirty days violates 29 U.S.C. § 1132(c)(1), and the Court may, in its discretion, hold Mercor personally liable to Plaintiff in an amount of up to $110 per day from June 11, 2026 until the requested documents are furnished. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.

238. Mercor's non-disclosure is prejudicial and continuing: it deprives Plaintiff of the plan terms needed to plead and prove Count V with precision, conceals whether and how Mercor's plans address common-law employees, and frustrates the statutory design of ERISA's disclosure regime, which exists so that participants can learn their rights under the plans that govern them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclasses, respectfully requests that the Court:

(A) Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

(B) Declare, solely for purposes of resolving Count V under ERISA and not for federal tax purposes, that Plaintiff and the Class are common-law employees of Mercor;

(C) Award Plaintiff and the Section 7434 Subclass the relief authorized by 26 U.S.C. § 7434(b), including statutory damages, actual damages, costs, and reasonable attorneys' fees, and make the finding required by § 7434(e), including that the correct amount reportable as nonemployee compensation on the challenged Forms 1099-NEC was $0;

(D) Award Plaintiff and the Audit-Deduction Subclass contract damages measured by hours Mercor deducted from logged Insightful time, plus interest; in the alternative, award Plaintiff and the Off-Insightful Policy Subclass contract damages measured by compensable work Mercor required outside Insightful, plus interest; and, in the further alternative, award Plaintiff and the Texas Subclass contract damages, interest, fees, and costs to the extent Texas law governs;

(E) Award Plaintiff and the Texas Subclass restitution for unjust enrichment, principally measured by the value of compensable labor Mercor accepted but did not pay for, and, in the alternative or as a nonduplicative equitable measure, the employer equivalent Social Security and Medicare amounts Mercor shifted to workers through self-employment tax;

(F) Order Mercor, to the extent plan terms and equitable predicates permit, to credit Plaintiff and eligible Class members with service credit and elective-deferral eligibility under any ERISA plan Mercor maintains, including eligibility under the long-term part-time employee rule; to award benefits owed or accrued under 29 U.S.C. § 1132(a)(1)(B); and to grant appropriate equitable relief, including employer matching and nonelective contributions only where Class members independently qualify under general plan terms or satisfy the equitable predicates pleaded above;

(G) Enter prospective declaratory and injunctive relief for the Current-Worker Injunctive Subclass, limited to Mercor's administration of ERISA-governed plans, requiring Mercor to credit Subclass members with the service, eligibility, and accrual time to which they are entitled as common-law employees;

(H) Award Plaintiff statutory penalties against Mercor under 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 of up to $110 per day from June 11, 2026 until Mercor furnishes the documents required by 29 U.S.C. § 1024(b)(4);

(I) Order Mercor to furnish forthwith the documents required by 29 U.S.C. § 1024(b)(4);

(J) Award Plaintiff and the Class their reasonable attorneys' fees, costs, and litigation expenses under 29 U.S.C. § 1132(g), 26 U.S.C. § 7434(b), Tex. Civ. Prac. & Rem. Code § 38.001, and any other applicable fee-shifting statute or rule;

(K) Award Plaintiff and the Class prejudgment and post-judgment interest at the maximum rate allowed by law;

(L) Award Plaintiff a reasonable service award in recognition of her service as Class Representative; and

(M) Grant such other and further relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable in this action.

Dated: June 25, 2026

Respectfully submitted.

/s/ Andrew B. Stephens
Andrew B. Stephens
Texas Bar No. 24079396
andrew@hackerstephens.com
Heather G. Hacker
Texas Bar No. 24103325
heather@hackerstephens.com
HACKER STEPHENS LLP
108 Wild Basin Rd. South, Suite 250

Austin, Texas 78746
(512) 399-3022 (phone)

*Attorneys for Plaintiff and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2026, I electronically filed the foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Andrew B. Stephens
Andrew B. Stephens